[No. B230053. Second Dist., Div. Six. Nov. 8, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
BRANDON RAY ARAUZ et al., Defendants and Appellants.

## COUNSEL

Linda C. Rush, under appointment by the Court of Appeal, for Defendant and Appellant Brandon Ray Arauz.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant Ulises Kline.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**YEGAN, J.**—Where, as here, an accomplice inculpates himself and his codefendant to a fellow inmate/informant, his statements, if trustworthy, are admissible in the codefendant's trial. Such statements are declarations against penal interest, are not "testimonial," and their admission does not violate the confrontation clause as explained in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*).

Brandon Ray Arauz and Ulises Kline appeal their convictions by jury for criminal street gang activity (Pen. Code, § 186.22, subd. (a))[1] and two counts of attempted premeditated murder (§§ 664, 187, subd. (a)) with gang, firearm, and great bodily injury enhancements (§§ 186.22, subd. (b)(1)(C), 12022.53, subd. (e)(1), 12022.7). The trial court sentenced Arauz to 64 years to life in state prison and Kline to 32 years to life in state prison.

Appellants contend that the trial court erred in admitting an accomplice's jailhouse statements to an informant and gang telephone wiretap recordings. We modify the sentence to (1) stay the concurrent two-year sentences on the criminal street gang counts (§ 654; *People v. Mesa* (2012) 54 Cal.4th 191, 197–198 [142 Cal.Rptr.3d 2, 277 P.3d 743]) and (2) strike the 10-year gang enhancements (§ 186.22, subd. (b)(1)(C)) and impose in their place 15-year minimum parole eligibility terms pursuant to section 186.22, subdivision (b)(5). (See *People v. Lopez* (2005) 34 Cal.4th 1002, 1004 [22 Cal.Rptr.3d 869, 103 P.3d 270].) The judgments, as modified, are affirmed.

### The Stroube Street Shootings

On the evening of February 15, 2008, Aaron A. and Andrew R. were walking home on Stroube Street in El Rio. When they approached Alvarado Street, R. saw a grey-primered Blazer pass by. Then they saw two Hispanic males. The shorter Hispanic man "whipped out" a handgun like "a cowboy"

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

and shot at them. R. was shot in the wrist. The other Hispanic man fired multiple shots. A. was shot in the nose.

Lydia P., who lived at the corner of Stroube and Alvarado Streets, heard the screech of car brakes and saw the Blazer stop. Two males exited the Blazer and ran towards Alvarado Street shooting semiautomatic weapons.

Glenda M., who lived on Stroube Street, heard six or seven gunshots fired in rapid succession. She found a .45-caliber bullet next to her driveway fence. Other bullets were found near the intersection. Officers responding to the 911 call recovered a live nine-millimeter round, three .45-caliber shell casings, and four live .45-caliber rounds. Forensic investigators found shoe prints and made cast impressions.

### Traffic Stop

The police believed the Stroube Street shootings were gang related. Two days later, the police lawfully intercepted a telephone conversation in which Kline and other Colonia Chiques gang members said they were getting guns and a car to do another shooting in El Rio. Thereafter, Deputy Sheriff Dean Worthy observed a black Honda occupied by two Hispanic males on Stroube Street. As the Honda drove by, two heads popped up in the backseat, looked in his direction, and ducked back down out of view.

Deputy Worthy stopped the Honda. Kline was one of the occupants in the car. Deputy Worthy found a .45-caliber semiautomatic handgun, a sawed-off 12-gauge shotgun, and a nine-millimeter semiautomatic handgun. All the weapons were loaded. The nine-millimeter handgun was on the rear floorboard next to Kline, who was wearing Nike shoes. A forensics expert determined that the shell casings and live rounds at the Stroube Street shootings were either fired or chambered/extracted from the handguns found in the Honda.

### Shoes

Officers executed a warrant to search appellant Arauz's bedroom and found a pair of size-11K Swiss shoes that closely resembled a shoe print at the Stroube Street shootings. The sole of the Nike shoes that Kline was wearing at the February 17, 2008 traffic stop resembled a shoe print at the shooting scene. But there were not enough identifying characteristics to make a positive identification.

### Telephone Wiretaps

In February 2008, the Ventura County Sheriff obtained a warrant in an unrelated case to monitor phone calls by Colonia Chiques gang members.

Thousands of telephone calls were monitored over a 30-day period. In 33 intercepted telephone calls, appellants and fellow gang members, including Jose Velasquez, talked about robberies and getting handguns to retaliate and shoot rival gang members.

*Accomplice's Jailhouse Statements*

On March 3, 2008, Jose Velasquez was booked on drug charges at Ventura County Jail and placed in a cell next to G.B., a paid confidential informant. Velasquez and G.B.'s conversation was surreptitiously recorded. G.B. said that he was associated with the Mexican Mafia and that Velasquez had been "greenlighted" because he and his "homies" committed a driveby shooting in violation of Mexican Mafia rules.[2] G.B. asked Velasquez about the shootings and said he would "run court" on him and advise other gang associates of his findings.

Velasquez was deceived by this ruse. He told G.B. that he drove "Thief" (Arauz) and "Little Terco" (Kline) to Alvarado Street in his Blazer. Thief had a nine-millimeter semiautomatic pistol and Little Terco had a .45-caliber semiautomatic pistol. Velasquez said that Thief and Little Terco exited the Blazer and shot two "homies from El Rio."[3]

*Gang Expert Testimony*

Oxnard Police Department Sergeant Christopher Williams, a gang expert, testified that the Colonia Chiques is an Hispanic criminal street gang with more than 1,000 members and is associated with, and is subordinate to, the Mexican Mafia. The Chiques' primary activities include street robberies, drug sales, violent assaults, and homicides. The El Rio street gang is a rival gang and its gang members are called "River Rats."

Sergeant Williams testified that Arauz and Kline were active members of the Colonia Chiques gang. Arauz was known as "Thief" and Kline was known as "Little Terco." In response to a hypothetical question, Sergeant Williams opined that the act of driving into El Rio gang territory and shooting rival gang members benefited the Colonia Chiques gang.

---

[2] In this context, a "green light" means the Mexican Mafia has targeted a gang member to be beaten or killed. (See, e.g., *People v. Sisneros* (2009) 174 Cal.App.4th 142, 148 [94 Cal.Rptr.3d 98].)

[3] There is no legal impediment to placing an informant next to a fellow inmate. "[I]n the often competitive enterprise of ferreting out crime" (*Johnson v. United States* (1948) 333 U.S. 10, 14 [92 L.Ed. 436, 68 S.Ct. 367]), the police are permitted to use a subterfuge to obtain an inculpatory statement as long as the subterfuge is not likely "to produce an untrue statement" (*People v. Felix* (1977) 72 Cal.App.3d 879, 886 [139 Cal.Rptr. 366]).

*Jailhouse Statements—Declaration Against Penal Interest*

Appellants contend that the trial court erred in admitting Velasquez's jailhouse statements as a declaration against penal interest. (Evid. Code, § 1230.) They argue that such statements were not "trustworthy" or "reliable" and that naming his codefendants was not "specifically disserving."

■ We review the trial court's ruling for abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 153 [115 Cal.Rptr.2d 614, 38 P.3d 461].) To be admissible, the out-of-court statement must be trustworthy and against the declarant's penal interest. (*People v. Leach* (1975) 15 Cal.3d 419, 441–442 [124 Cal.Rptr. 752, 541 P.2d 296].) "Under the rule of *Leach*, a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' [Citations.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 612 [101 Cal.Rptr.2d 701, 12 P.3d 1110].)

■ Appellants argue that Velasquez's statements were not trustworthy because Velasquez was told that he had been "greenlighted" by the Mexican Mafia for committing a driveby shooting.[4] "There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.]" (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334 [68 Cal.Rptr.2d 61].)

In *People v. Duarte, supra*, 24 Cal.4th 603, Morris and the defendant committed a driveby shooting. After arrest, Morris told the police that he did not want to kill anybody and "shot high" to avoid harming anyone. (*Id.*, at p. 613.) The Supreme Court concluded that the statement lacked trustworthiness and was not "specifically disserving" of Morris's penal interest. (*Ibid.*)

---

[4] Kline also argues that jailhouse recording was unreliable because no one identified Velasquez's voice. Ventura County Deputy Sheriff Ian Laughlin moved Velasquez to the jail cell next to G.B. so they were alone. No one else was in Velasquez's cell. On the jail audiotape, Velasquez says his real name is "Jose but everybody knows me as Bebe or Tokyo." Velasquez says, "I'm the Colonia Chiques gang" and that he was "busted" with "Thief" (Arauz) who was downstairs being booked. Velasquez says that he drove a "primer black and gray" Blazer.

Velasquez's voice was identified by Sergeant Williams who reviewed the telephone wiretaps and identified calls between Velasquez and Arauz and Velasquez and Kline. A telephone wiretap log includes an index of calls to and from Velasquez and his phone number. In the recorded telephone calls, Velasquez identifies himself as "Bebe" and refers to appellants by their gang monikers.

Unlike the defendant in *Duarte*, Velasquez did not speak to a police officer or try to shift the blame to appellants. Velasquez thought he was answering to an inquiry from the Mexican Mafia. This "context" (*id.* at p. 613) is particularly compelling and augers in favor of admissibility. Velasquez said that he drove appellants to El Rio and they shot the two victims. He was candid about his role in the shooting and bragged that it was a "legit shooting." The statement was " 'so far contrary to [Velasquez's] interests "that a reasonable man in his position would not have [said it] unless he believed it to be true." ' [Citations.]" (*People v. Brown* (2003) 31 Cal.4th 518, 536 [3 Cal.Rptr.3d 145, 73 P.3d 1137].)

■ Velasquez's "facially incriminating comments [implicating himself and identifying appellants by their gang monikers] were in no way exculpatory . . . ." (*People v. Samuels* (2005) 36 Cal.4th 96, 120 [30 Cal.Rptr.3d 105, 113 P.3d 1125].) His detailed statements were part of his explanation to someone he thought was "running court" for the Mexican Mafia. Although the conversation was a question and answer session, Velasquez's statements were "inextricably tied to and part of a specific statement against penal interest. [Citation.]" (*Id.* at p. 121.) Such specificity, including naming both appellants as the actual shooters, shows "trustworthiness." The trial court did not err in finding that the statements implicating himself and appellants were "specifically disserving," and thus admissible as a declaration against penal interest. (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 176 [12 Cal.Rptr.3d 774].)

### Jailhouse Statements—Confrontation Clause

■ Appellants contend that Velasquez's jailhouse statements violated their Sixth Amendment right of confrontation and cross-examination which they argue imposes a higher standard of trustworthiness for testimonial hearsay. (See *People v. Cervantes, supra*, 118 Cal.App.4th at p. 172.) In *Crawford, supra*, 541 U.S. 36 [158 L.Ed.2d 177], the United States Supreme Court described testimonial hearsay as " '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or . . .' . . . 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Id.*, at pp. 51–52 [158 L.Ed.2d at p. 193].)

Pursuant to *Crawford*, out-of-court statements can be divided into police interrogations ("testimonial" hearsay) and statements in which no interrogation takes place ("non-testimonial" hearsay). (*Crawford, supra*, 541 U.S. at pp. 52–53 [158 L.Ed.2d at p. 193]].) Nontestimonial hearsay is subject only to "traditional limitations upon hearsay evidence" and does not implicate the

Sixth Amendment right of confrontation. (*Davis v. Washington* (2006) 547 U.S. 813, 821 [165 L.Ed.2d 224, 237, 126 S.Ct. 2266]; see *People v. Cooper* (2007) 148 Cal.App.4th 731, 740–741 [56 Cal.Rptr.3d 6].) In *Davis v. Washington, supra,* 547 U.S. at page 825 [165 L.Ed.2d at page 239], the court gave examples of nontestimonial statements: "statements made unwittingly to a Government informant" and "statements from one prisoner to another." That is the case here.

█ Velasquez thought he was answering to the Mexican Mafia. He had no belief that his statements were being monitored and would be used in a subsequent trial. (See *U.S. v. Summers* (10th Cir. 2005) 414 F.3d 1287, 1302 [proper focus is whether declarant believed statement would later be used as evidence].) Federal courts have repeatedly held that statements unwittingly made to an informant are not "testimonial" for confrontation clause purposes. (*U.S. v. Tolliver* (7th Cir. 2006) 454 F.3d 660, 665; *U.S. v. Underwood* (11th Cir. 2006) 446 F.3d 1340, 1347–1348; *U.S. v. Hendricks* (3d Cir. 2005) 395 F.3d 173, 182–184; *U.S. v. Saget* (2d Cir. 2004) 377 F.3d 223, 229–230; *U.S. v. Smalls* (10th Cir. 2010) 605 F.3d 765, 778 [prisoner's recorded statement to a fellow prisoner who was actually a government informant is "unquestionably nontestimonial"].) We agree with the rule and rationale of these cases. We hold that statements unwittingly made to an informant are not "testimonial" within the meaning of the confrontation clause. The last thing Velasquez expected was for his statement to be repeated in court. (*E.g., People v. Cervantes, supra,* 118 Cal.App.4th at p. 175 [declarant had no reason to believe his nontestimonial statement would be relayed to law enforcement or be used at trial].)

█ Appellants argue that G.B. was "prepped" by the police and conducted a de facto interrogation.[5] The argument fails because an informant's level of preparedness prior to questioning an intended target is not controlling. (See *Michigan v. Bryant* (2011) 562 U.S. ___, ___, fn. 11 [179 L.Ed.2d 93, 113, fn. 11, 131 S.Ct. 1143].) " '[I]t is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate.' [Citation.] . . . An interrogator's questions, unlike a declarant's answers, do not assert the truth of any matter." (*Ibid.*)

### *Telephone Wiretaps*

█ Appellants claim that the telephone wiretap evidence was cumulative and violated their due process right to a fair trial. Federal due process rights

---

[5] Kline argues that it is unknown what instructions G.B. received from the police. Sergeant Ian Laughlin testified: "In our briefing with Mr. [B.], we gave him generalities of what we were looking for . . . . We allowed him to formulate the script. We didn't specifically tell him, you know, represent yourself as a Mexican Mafia member and say that there is a green light. We didn't give him detailed instructions like that."

are not implicated where the disputed evidence is relevant and admissible to show intent, motive, identity, knowledge, common plan, and gang status. (Evid. Code, § 1101, subd. (b); *People v. Catlin* (2001) 26 Cal.4th 81, 122–123 [109 Cal.Rptr.2d 31, 26 P.3d 357].) The application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution. (*People v. Marks* (2003) 31 Cal.4th 197, 227 [2 Cal.Rptr.3d 252, 72 P.3d 1222].)

Overruling appellants' Evidence Code section 352 objection, the trial court stated: "We know two people were shot. The issue in this case is identity. The issue is who did it. To ask the jury to address this in a vacuum and sit there and listen to evidence about two people being shot for no reason whatsoever makes no sense. I mean, certainly the jurors should be able to consider why this happened in addressing the issues in this case. I am sure it is one of the first questions that crossed the jurors' mind when they heard about the shooting is why, why would it happen. There was no theft. There was no other apparent motive for this crime."

 We review the trial court's ruling for an abuse of discretion. There was none. (*People v. Williams* (1997) 16 Cal.4th 153, 193 [66 Cal.Rptr.2d 123, 940 P.2d 710] [gang evidence admissible to show motive and identity].) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [16 Cal.Rptr.3d 880, 94 P.3d 1080].)

The recorded telephone wiretaps were properly admitted to show that the Colonia Chiques was a criminal street gang, appellants' gang membership and activities, and to prove identity, intent, knowledge, and motive. The telephone calls established the primary activities of the Colonia Chiques gang (robberies, drug sales, violent assaults, homicides), appellants' relationship with Velasquez, and why and how appellants committed a retaliatory shooting in El Rio. In a February 17, 2008 call (two days after the Stroube Street shootings), Kline complained that the River Rats "came right here and shot at us . . . ." Kline said, "this is gangbanging shit" and urged fellow gang members to "go banging to El Rio right now." In another call, Arauz complained about how difficult it was to get bullets and guns and that "People have shit [(i.e., guns and bullets)], but they don't want to let us use it because they saw what we do with it." In a February 24, 2008 phone call, Arauz says "we need to do a one for one and set an example" and "go to the river" and "shoot 'em some extra balas [(bullets)] . . . ."

■ The jury was instructed: "It is up to you to decide whether either defendant Brandon Arauz or Ulises Kline were involved in any of these telephone conversations. If you believe any conversations implicated either defendant in criminal activity you may only consider this evidence for the limited purpose of deciding whether the defendants acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements in this case. . . . You may not conclude from the evidence that the defendants are persons of bad character or that they have a disposition to commit crime or acts of violence." (CALCRIM No. 1403.) It is presumed that the jury understood and followed the instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 [111 Cal.Rptr.2d 129, 29 P.3d 209].)

Appellants make no showing that the wiretap evidence was "so extraordinarily prejudicial, and of so little relevance to guilt, that it threaten[ed] to sway the jury to convict regardless of the defendant's actual guilt." (*People v. Hernandez, supra,* 33 Cal.4th at p. 1049.)

*Sentencing Error*

Appellants were sentenced to seven-year-to-life terms on the attempted premeditated murder counts plus 25-year-to-life terms on the firearm use enhancements (§ 12022.53, subd. (e)(1)).[6] The trial court imposed concurrent two-year terms on the street terrorism counts (§ 186.22, subd. (a); count 1—Arauz/count 4—Kline) and stayed the other sentence enhancements including the section 186.22, subdivision (b)(1)(C) 10-year gang enhancement.

■ In *People v. Mesa, supra,* 54 Cal.4th 191, our Supreme Court recently held that section 654 precludes punishment for both street terrorism (§ 186.22, subd. (a)) and the underlying felony (here attempted premeditated murder) used to satisfy the gang participation element. (54 Cal.4th at pp. 197–198.) Pursuant to *Mesa,* we stay the two-year sentence on the street terrorism counts (count 1—Arauz; count 4—Kline).

■ With respect to the gang enhancement (§ 186.22, subd. (b)(1)(C)) that was imposed but stayed on the attempted premeditated murder counts, the 10-year enhancements are stricken and we impose in their place 15-year minimum parole eligibility terms pursuant to section 186.22, subdivision (b)(5). Where, as here, a defendant is sentenced to an indeterminate life

---

[6] Arauz received consecutive seven-year-to-life terms on counts 2 and 3 for attempted premeditated murder, plus a 25-year firearm enhancement on each count for an aggregate sentence of 64 years to life in state prison. Because Kline was under the age of 18, the trial court sentenced Kline to concurrent seven-year-to-life terms on the attempted premeditated murder counts (counts 5 and 6) plus 25 years on the firearm use enhancement, resulting in an aggregate sentence of 32 years to life in state prison.

term for attempted murder, the 15-year parole eligibility provision of section 186.22, subdivision (b)(5) applies rather than the 10-year gang enhancement. (See *People v. Lopez, supra*, 34 Cal.4th at p. 1004.)

Appellants' remaining arguments have been considered and merit no further discussion.

## Conclusion

The judgments are modified to (1) stay the two-year sentence on the street terrorism counts pursuant to section 654 and (2) strike the 10-year gang enhancements (§ 186.22, subd. (b)(1)(C)) and impose, in their place, 15-year minimum parole eligibility terms (§186.22, subd. (b)(5)) on the attempted premeditated murder counts. In all other respects, the judgments are affirmed. The trial court is directed to prepare corrected abstracts of judgment and to forward certified copies to the Department of Corrections and Rehabilitation.

Gilbert, P. J., and Perren, J., concurred.

Appellants' petitions for review by the Supreme Court were denied February 13, 2013, S207016.