Filed 8/6/14  P. v. Hernandez CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEREMIAH HERNANDEZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B242388<br>(Super. Ct. No. F462901)<br>(San Luis Obispo County) |

Jeremiah Hernandez appeals from the judgment following his conviction by jury of arson (Pen. Code, § 451, subd. (d) [count 1]);[1] malicious cross burning (§ 11411, subd. (d) [count 2]); terrorism by arson (§ 11413, subds. (a), (b)(9) [count 3]); and conspiracy to commit malicious cross burning (§§ 182, subd. (a)(1), 11411, subd. (d) [count 4]), with true findings as to several hate crime allegations (§ 422.75, subd. (b)).  In bifurcated proceedings, the trial court found three prior prison term allegations were true. (§ 667.5, subd. (b).)  The court sentenced appellant to 11 years in state prison.[2]

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] His sentence includes a five-year middle term for terrorism by arson with a three-year hate crime enhancement, and three 1-year prior prison term enhancements. The court imposed and stayed the sentences for the other crimes.  (§ 654.)

Appellant contends that (1) there is insufficient evidence to support the hate crime findings; (2) the trial court erred by admitting certain evidence; (3) the "*Williamson* rule" bars his prosecution and conviction for arson and terrorism by arson because he was subject to prosecution under a more specific statute (*In re Williamson* (1954) 43 Cal.2d 651); (4) the malicious cross burning statute is facially invalid under the First Amendment; and (5) the malicious cross burning statute violates the First Amendment, as applied to this case, because it restricts speech, based on its content. We conclude the *Williamson* rule bars appellant's prosecution for arson and terrorism by arson, as charged in counts 1 and 3. Thus, we reverse and dismiss counts 1 and 3, strike the attached hate crime enhancements, and vacate the sentence for counts 1 and 3, and the attached hate crime enhancements.[3] We remand to the trial court for resentencing and otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

On March 18, 2011, shortly after midnight, appellant, Jason Kahn, William Soto, and Sarah Matheny burned an 11-foot cross in the front yard of 186 South Elm Street in Arroyo Grande. Jamie Wallace, who was then pregnant, lived there with her husband and their toddler. Gabrielle Foster, an African-American teenager, and her mother, Lisa Montoya, lived next door to the Wallace family. Foster's bedroom window overlooked the Wallace property. Neither Montoya nor any Wallace family member is African-American. Arroyo Grande has a small African-American population. In the 2010 census, .9 percent of its residents identified themselves as Black.

Just before midnight, Foster was in her bedroom watching television with a friend. Foster heard something outside. She turned the interior light on and off, then went outside. Finding nothing unusual, she returned to her bedroom. Within minutes,

---

[3] Because the *Williamson* rule compels the reversal of the terrorism by arson conviction and the dismissal of that charge, we do not address the following contentions: there is not sufficient evidence to support terrorism by arson; the terrorism by arson statute is unconstitutional as applied; and the trial court erred by imposing the section 422.75, subdivision (b) enhancement for terrorism by arson.

Foster noticed her curtains appeared to turn an orange-red color. She looked outside and saw a cross burning. Upset and afraid, Foster awakened Montoya and called 911. The cross was "fully engulfed in flames," and it fell quickly. It continued burning until the police arrived and extinguished the flames.

Arroyo Grande Police Department Detective Kevin McBride testified the cross was approximately 11 feet tall and 7 feet wide, and "very heavy." A channel in the cross's long, vertical plank held a support brace. Based upon the burn patterns on the cross, McBride concluded the perpetrators filled the channel with gasoline before they erected and ignited the cross. McBride observed burned grass and a hole with gasoline traces where the cross had stood, on the side of the Wallace property, about 23 feet from Foster's bedroom window.

The cross burning frightened Foster and Montoya. Montoya recognized it as a message of intimidation and hate. They moved away from Elm Street, in part because of the cross burning.

The Wallace family did not sleep at home on the evening of March 17 due to ongoing work in their house. When Jamie Wallace returned the following morning, she found a burned patch in the yard, a hole and some "messed up dirt." She had "the chills" upon learning of the cross burning and was scared for "a good couple months."

A March 17, 2011, surveillance video shows a red SUV with lumber on its roof entered a Grover Beach gas station, at 11:29 p.m. Donald Richards, the owner of that SUV, had loaned it to Kahn and Soto earlier that day. Kahn, Soto, Matheny, and appellant are in the video.

Just before midnight, Anna Taylor saw three men and a woman assemble a wooden cross in the parking lot of her apartment building. They placed the cross on top of a small red SUV and left. Taylor's building is close to the Wallace property, on a nearby street.

In late March, and again in early April 2011, Sean Schmidt drove Soto and appellant to Cambria, to visit Soto's girlfriend, Chelsea McIntyre. Soto and appellant discussed the cross burning in Schmidt's presence. They referred to a residence on Elm

3

Street in Arroyo Grande, and said they burned a cross to commemorate the death of Kahn's father. They also said it was only a coincidence that they burned it outside the window of an African-American girl. Schmidt said they seemed to be bragging about the cross burning, and discussing it in a "light" tone. It bothered Schmidt.

The parties stipulated that "Jason Kahn's father, Rick Kahn, was justifiably killed by [sheriff's deputies] at 186 South Elm Street during a confrontation . . . on August 13, 1994 [and that] Rick Kahn's birthday was March 19th." On March 19, 2012, a year after the cross burning, a man knocked on the Wallaces' door. Jamie Wallace answered, and he asked if he could put some flowers on her property to honor Jason Kahn's father, who was killed there. She declined his request and called the police. The Wallace family bought their Elm Street property in 2007. They had not previously known anyone had been killed there.

Schmidt testified that Kahn, Soto and appellant were racists. Richards testified that Kahn was a racist skinhead and Soto was "trying to fit in that way." Soto and Kahn were usually seen together. Kahn had a large swastika tattoo on his left shoulder, a swastika within a Celtic cross tattoo on his chest, a tattoo with a skinhead crucified on a Celtic cross on the back of his head, and a "White Power" tattoo on his left arm.

On April 12, 2011, a deputy sheriff found appellant and Matheny in a San Simeon motel room. He arrested them for a crime unrelated to cross burning, and recovered Matheny's day planner. It had a drawing of a cross in the March 17 space, next to the words, "Became an Outlaw." (The Outlaws was a group appellant was trying to found.) Matheny wrote "kicked it with love" (appellant) in the notes section below the March 17, 18, and 19 spaces. The space for March 19 has a cross, with the statement, "Cross Burning front page!" After their arrests for the cross burning, appellant and Matheny wrote letters with references to Outlaw "agreements."

Professor Brian Levin teaches criminal justice at California State University, San Bernardino, and specializes in anti-government extremism and hate crimes. He testified that former Confederate soldiers formed the first Ku Klux Klan in

4

1865 or 1866.  They rode on horseback, at night, with burning torches, to terrorize recently freed slaves.  Later, a second Ku Klux Klan was formed.  It was "anti-Catholic . . . anti-Semitic," and "[v]irulently anti-Black."  The second Klan began the practice of cross burning at night to make "terrorist threats" of "impending violence," often before or after lynching an African-American.  That Klan also held ceremonial, private cross burnings for members.  Public, terrorist cross burnings still convey a threat to "get out" of an area or be killed.  Levin further testified that swastikas symbolize hatred of Jews and African Americans, and the Celtic cross is popular in the "neo-Nazi and white supremacist movement[s]."

Before trial, Soto, Matheny and Kahn pled no contest to malicious cross burning and admitted the associated hate crime allegations.  Kahn also pled no contest to terrorism by arson and admitted the attached hate crime allegation.

*Defense Evidence*

Several witnesses testified they saw appellant at the Grover Beach Inn around the time of the cross burning.  Appellant's father, Rebel Whitewolf, testified that appellant never left the inn for more than half an hour.  Whitewolf and his girlfriend, Kristen Nordlund, stayed in one room at the inn.  Following his March 15 release from jail, appellant stayed in the adjacent room, with Matheny.  Other motel guests complained to John Harrington (the inn manager) that Matheny was using the motel's back gate and appellant's friend, Will Soto, was jumping over the fence on the side of the motel.  On March 17, Whitewolf saw appellant at 11:00 p.m.  He heard him playing a video game at 11:30 p.m.  Other witnesses, including Harrington, Nordlund, and family friends Randall Piper and Hope Fiore testified they saw appellant at the inn during the afternoon or evening on March 17.

McIntyre testified that Schmidt drove Soto to visit her in March and April of 2011, and appellant was with them on at least one of those occasions.  She also testified they never discussed a cross burning in her presence.

Dr. Robert Shomer, a psychologist who has researched perception, memory and eyewitness identifications, testified about factors which can affect eyewitness

5

identification.  When presented with a hypothetical question based on the circumstances of a police officer's identification of appellant in the March 17 gas station video, Dr. Shomer opined that the officer's identification would be tainted.

DISCUSSION

*Substantial Evidence Supports the Hate Crime Findings*

Appellant contends there is not sufficient evidence to support the hate crime findings.  We disagree.

In assessing the sufficiency of evidence, we consider the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence that is "reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Burney* (2009) 47 Cal.4th 203, 253.)  We presume all facts in support of the judgment which can be deduced from the evidence, and do not reweigh the evidence or redetermine credibility.  (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)  We must accept logical inferences that the jury might have drawn from the evidence although we could have concluded otherwise.  (*People v. Streeter* (2012) 54 Cal.4th 205, 241.)  Reversal is warranted only if there is no substantial evidence to support the conviction under any hypothesis.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  The same deferential standard also applies to our review of hate crime findings.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 37-38 [sufficiency of the evidence of the section 190.2, subd. (a)(16) hate-crime special circumstance].)

Section 422.75 authorizes enhanced penalties if a person commits a hate crime with another person.  A hate crime includes "a criminal act committed, in whole or in part, because of" the victim's race or ethnicity (§ 422.55, subd. (a)(4)), or the victim's "[a]ssociation with a person" of a particular race or ethnicity (*id*. at subd. (a)(7)).  "Association" includes being on property "adjacent to" any person of a particular race or ethnicity.  (§ 422.56, subd. (a).)  If a hate crime has multiple causes, "the bias motivation must [be] a cause in fact of the offense."  (§ 422.56, subd. (d); *People v. Superior Court* (*Aishman*) (1995) 10 Cal.4th 735, 741.)

6

To prove a hate crime allegation, the state must "'. . . show evidence of bigotry relating *directly* to the defendant's intentional selection of this particular victim upon whom to commit the charged crime. The state must directly link the defendant's bigotry to the invidiously discriminatory selection of the victim and to the commission of the underlying crime.'" (*In re Joshua H*. (1993) 13 Cal.App.4th 1734, 1753.) However, proof of motivation or intent "is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.)

In arguing there was no evidence the crimes were racially motivated, appellant stresses the evidence that Kahn selected the Wallace property as the cross burning site in memory of his father, who was killed there. The jury rejected the "memorial" theory. It is not the function of this court to reweigh the evidence. (*People v. Wilson, supra,* 44 Cal.4th at p. 806.)

Appellant further asserts the cross burning and other crimes were not racially motivated because there was no evidence that any of the perpetrators knew Foster lived next door to the Wallace property. We conclude there was substantial circumstantial evidence to support the inference that Kahn, and his accomplices, knew Foster lived next to the Wallace property.

Witnesses consistently described Kahn as a racist. His multiple tattoos displayed his hatred and white supremacist beliefs. He was familiar with the Wallace property on Elm Street as the site of his father's 1994 killing. Foster and her friends often gathered and danced in front of her house, next door to the Wallace property. As the prosecutor argued, the evidence supported the inference that Kahn and his friends noticed Foster, an attractive African American teenager, dancing there. Kahn and Soto were usually seen together, and they shared a cell phone. In the hours preceding the March 17 cross burning, there was ongoing communication between Matheny's phone and the phone shared by Kahn and Soto. After appellant's release from prison, Matheny accompanied him and stayed with him in his motel room, and she was with him on March 17, in the hours before the cross burning. That evidence supports the inference

7

that Kahn and Soto communicated with Matheny, and through her, with appellant, to enlist their assistance in assembling, moving and burning the heavy wooden cross. Other evidence, including Matheny's day planner and the video evidence, establishes that Matheny and appellant helped Kahn and Soto do so.

In addition to the evidence of Kahn's racial bias, Schmidt testified that appellant and Soto discussed the cross burning in a light tone, and seemed to be bragging about it, and that appellant was a racist. While in custody after his arrest for the cross burning, appellant wrote a letter in which he referred to a "black guy" he had rushed in jail as an "o'rooty poot ass nigga." Jurors could reasonably infer from the evidence that Kahn's racism motivated him to burn a cross on the Wallace property, 24 feet from Foster's window, to intimidate Foster and the Wallaces, and that his accomplices shared his racially biased intent. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.)

Appellant further argues there is not substantial evidence to support the hate crime findings because there is not substantial evidence he "was motivated by bias against the Wallaces [who are white] within the meaning of the hate crime statutes." We disagree. A hate crime can be based upon the race or ethnicity of a victim's associates, which includes her neighbors. (§§ 422.55, subds. (a)(4), (7), 422.56, subd. (a).) Substantial evidence supports the inference that Kahn, appellant, Soto and Matheny were motivated by racial bias to burn a cross on the Wallace property, based on the Wallace family's association with their African American neighbor.

*Evidentiary Rulings*

Appellant argues that the trial court erred by admitting Matheny's day planner and other items into evidence. We disagree.

All relevant evidence is admissible and the trial court has broad discretion in determining its relevance. (*People v. Riggs* (2008) 44 Cal.4th 248, 289.) We apply "the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question [citations]." (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) "'[A] trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial

8

court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

Appellant argues the trial court erred in ruling that hearsay statements from Matheny's day planner were admissible because they were against her penal interest. We disagree. Evidence Code section 1230 authorizes the admission of an out-of-court statement provided it is "trustworthy and against the declarant's penal interest." (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1400 (*Arauz*).) Appellant asserts that the day planner statements were not against her penal interest, with the exception of the references to cross burning. Examples of the challenged statements follow: A March 17 notation that Matheny "Became an Outlaw," next to a cross; an entry suggesting she "kicked it" with appellant from March 15 through March 19; and a notation that she was "kicked out of [his] mom's home" on March 28.

In determining whether a statement falls within the declaration against penal interest exception to the hearsay rule, the trial court must view "the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, [and] what was actually said," among other things. (*Arauz, supra*, 210 Cal.App.4th at p. 1400.) Appellant claims the challenged day planner statements merely show Matheny's association with him and the Outlaws, which by itself is not illegal. The record belies his claim. Matheny did not merely associate with appellant and the Outlaws. She was at the gas station with him, Kahn and Soto in the red SUV they used to carry the cross to the Wallace property immediately before they burned it. The trial court correctly ruled the challenged day planner statements were admissions against Matheny's penal interest, and not unduly prejudicial.

Appellant further contends the trial court erred by admitting letters he and Matheny wrote from jail because they were irrelevant, and their prejudicial impact outweighed their probative value. (Evid. Code, § 352.) He also contends that the admitted statements from Matheny's letter were inadmissible hearsay. We reject both

9

contentions. In his September 17, 2011, letter to Samantha Stokes and his September 23, 2011, letter to Matheny, appellant expressed his love for Matheny, and signed as "Outlaw Jeremiah Hernandez." His letter to Stokes described the Outlaw "agreements," and said they were "like marriage vows" to him and Matheny. The court cited appellant's references to the Outlaws, the same group which Matheny noted having joined in her March 17 day planner entry. The statements in appellant's letters, along with other evidence, were probative to show his involvement with Matheny in the conspiracy and other charged crimes. The trial court properly admitted them.

Appellant also argues the trial court erred by admitting hearsay statements from Matheny's August 17, 2011, letter. We disagree. The admitted portions of her letter were written recitations of the Outlaw "agreements." Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) As the court instructed the jury, the statements from Matheny's letter were "not being offered for the truth of what's . . . contained in the statements [but] for another purpose." That purpose was to show that she and appellant recited the same Outlaw "agreements." One such agreement stated: "We always stick together no matter what, and we don't turn our backs on anyone from our crew." That statement was not hearsay, because it was not offered to prove that Outlaws did not turn their backs on other Outlaws. Rather, it was offered to show appellant and Matheny belonged to the same group, which, along with other evidence, supported the inference that they conspired to and did commit the cross burning together.

Citing *People v. Collins* (1968) 68 Cal.2d 319, appellant argues the trial court abused its discretion by admitting evidence that ".9 percent of persons in Arroyo Grande described themselves as 'black.'" *Collins* is unavailing. It concerned defendants who matched the description of a couple who committed a robbery--a "male Negro" and a blonde Caucasian woman, and the use of expert testimony regarding statistical probabilities. (*Id*. at 320-321, 325.) "[B]ased on the physical characteristics of [such] a couple who committed a crime and their getaway vehicle," the expert opined that "the

10

probability that such a duo in such a car would appear at a given moment was one in twelve million." (*People v. Yorba* (1989) 209 Cal.App.3d 1017, 1026.) The Supreme Court reversed the judgment in *Collins* because "the expert's opinion testimony had no basis in the facts," and his explanation of the product rule "encouraged jurors to rely upon 'an . . . irrelevant expert demonstration.' [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1228.) In contrast, there was no expert opinion concerning statistical probabilities below. There was only raw data reflecting the low number of Blacks in Arroyo Grande, which could support the inference that Foster's presence there would stand out. The trial court properly admitted that data. With other evidence, it was relevant to the issue of the defendant's knowledge that an African American lived next to the Wallace property.

### The Williamson Rule Precludes Appellant's Prosecution
### Under the Terrorism by Arson and Arson Statutes

Citing the "*Williamson* rule," appellant asserts he cannot be prosecuted for arson of property under section 451, subdivision (d), or for terrorism by arson under section 11413, subdivisions (a) and (b)(9) for burning the cross on the Wallace property. Rather, he argues he was subject to prosecution for such conduct only under the more specific cross burning statute, section 11411, subdivision (d). (*In re Williamson*, *supra*, 43 Cal.2d at p. 654.) We agree.

"Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute. In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute." (*People v. Murphy* (2011) 52 Cal.4th 81, 86.) "Absent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.'" (*Ibid.*)

11

The relevant provisions of the terrorism by arson statute (§ 11413, subds. (a), (b)(9)) state: "(a) Any person who . . . commits arson, in or about any of the places listed in subdivision (b), for the purpose of terrorizing another or in reckless disregard of terrorizing another is guilty of a felony, and shall be punished by imprisonment in the state prison for three, five, or seven years . . . . [¶] (b) Subdivision (a) applies to the following places: . . . [¶] (9) Any private property, if the property was targeted in whole or in part because of any of the actual or perceived characteristics of the owner or occupant of the property listed in subdivision (a) of Section 422.55." The characteristics listed in section 422.55 include race and association with a person of one of the listed characteristics. (§ 422.55, subds. (a)(4), (a)(7).)

The pertinent provisions of the cross burning statute (§ 11411, subd. (d)) state: "Any person who burns . . . a cross . . . , knowing it to be a religious symbol, on the private property of another without authorization for the purpose of terrorizing the owner or occupant of that private property or in reckless disregard of the risk of terrorizing the owner or occupant of that private property, . . . shall be punished by imprisonment in the state prison for 16 months or 2 or 3 years, . . . or by imprisonment in a county jail not to exceed one year . . . ."

Appellant argues that the section 11411, subdivision (d) cross burning statute is more specific than the section 11413, subdivisions (a) and (b)(9) terrorism by arson statute. "'"The problem . . . is one of trying to ascertain the legislative intent . . . .'" [Citation.]" (*People v. Alberts* (1995) 32 Cal.App.4th 1424, 1427 (*Alberts*).) Did the Legislature intend that burning a cross on the property of another person with reckless disregard of the risk of terrorizing its owner or occupant be prosecuted under section 11413, subdivisions (a) and (b)(9) and punished with its penalty scheme of three, five, or seven years in prison? Or did it intend that such conduct be prosecuted only under section 11411, subdivision (d) and punished with its lesser penalty scheme (sixteen months, two or three years in prison, or one year in county jail)?

Several factors compel the conclusion that the cross burning statute, section 11411, subdivision (d) controls here. "First, '[i]t is the policy of this state to construe a

12

penal statute as favorably to the defendant as its language and the circumstances of its application may reasonably permit; just as in the case of a question of fact, the defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in a statute.' [Citations.]" (*Alberts, supra*, 32 Cal.App.4th at p. 1427.)

Second, the Legislative history of the section 11413 terrorism by arson statute shows the Legislature recognized the ordinary impact of the *Williamson* rule. In 1997, it added the following language to subdivision (e): "Nothing in this section shall be construed to prohibit the prosecution of any person pursuant to Section 12303.3 [now 18740] or any other provision of law in lieu of prosecution pursuant to this section." In proposing that language, the Senate Committee on Criminal Procedure explained that section 11413 required amendment to clarify the scope of another, more general, statute for which section 11413 was considered the more specific provision. "The law generally provides that a special statute may not control if the Legislature intended that the general statute remain available. [Citation.] The Los Angeles District Attorney has pointed out that there is a potential conflict between the *general statute* proscribing bombing, [former] Section 12303.3 [now § 18740], and the *specific statute*, Section 11413. In response to that concern, the author has amended [Sen. Bill No.] 16 to clarify the Legislature's intent that violations which fall under both Sections 11413 and 12303.3 may be prosecuted under either section." (Sen. Com. on Crim. Proc., Analysis of Sen. Bill No. 16 (1997-1998 Reg. Sess.) Mar. 18, 1997, italics added.) In contrast, the Legislature did not include any language in section 11411, subdivision (d) authorizing the prosecution of cross burnings under the more general terrorism by arson statute.

Third, relatively speaking, the conduct prescribed in section 11411, subdivision (d) is "specific" and the conduct prescribed in section 11413 is "general" within the meaning of the *Williamson* rule. """It is the general rule that where the general statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute whether it was passed before or after such general enactment."' . . . [Citation.]" (*Alberts*, *supra*, 32

13

Cal.App.4th at p. 1428.)  The *Williamson* rule precludes appellant's prosecution for terrorism by arson.

The *Williamson* rule also precludes appellant's prosecution for arson of property.  First, the arson of property statute (§ 451, subd. (d)) is far more general than the cross burning statute.  Second, the statutory context suggests "'. . . that a violation of the special statute [malicious cross burning, § 11411, subd. (d)] will . . . commonly result in a violation of the general [arson] statute.'"  (*People v. Murphy, supra,* 52 Cal.4th at p. 86.)  Specifically, burning a cross (owned by oneself or another) "on the property of another" is a requisite element of malicious cross burning.  While a cross burner *could* avoid burning the property of another upon which he burns his own cross, violations of the cross burning statute will "commonly result in a violation of the" arson of property statute.  Thus, the *Williamson* rule precludes prosecution for arson of property.  (*Ibid.*)

*The Malicious Cross Burning Statute Is Facially Constitutional*

Appellant contends the malicious cross burning statute (§ 11411, subd. (d)) is facially invalid because it criminalizes constitutionally protected speech or expression absent an intent to terrorize anyone, in violation of the First Amendment.  We disagree.

"'Congress shall make no law . . . abridging the freedom of speech.'  (U.S. Const., 1st Amend.)  This proscription, as incorporated through the Fourteenth Amendment's due process clause, likewise binds the states.  [Citation.]  The provision is not absolute, however.  Not within the First Amendment's protection are 'certain well-defined and narrowly limited classes of speech'—those '"of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."'  [Citations.]  Falling into that category are what the United States Supreme Court has described as 'true threats.'  [Citations.]"  (*People v. Lowery* (2011) 52 Cal.4th 419, 423 (*Lowery*).)

"Section 11411, enacted in 1982, proscribes various acts of racial, ethnic, and religious terrorism.  Subdivision [(d)] of the statute provides, 'Any person who burns or desecrates a cross or other religious symbol, knowing it to be a religious symbol, on the private property of another without authorization for the purpose of terrorizing the

14

owner or occupant of that private property or in reckless disregard of the risk of terrorizing the owner or occupant of that private property' is guilty of a crime, which may be prosecuted as a misdemeanor or a felony. Subdivision [(e)] defines '"terrorize"' as 'to cause a person of ordinary emotions and sensibilities to fear for personal safety.' (§ 11411, subd. (d).)" (*In re Steven S.* (1994) 25 Cal.App.4th 598, 606.)

Citing *Lowery, supra,* 52 Cal.4th at page 425, appellant argues *Virginia v. Black* (2003) 538 U.S. 343 mandates that a constitutionally valid cross burning statute must include an intent to intimidate. In *Lowery* the defendant argued "that a statute such as section 140(a), which punishes verbal threats, violates the First Amendment unless it is limited to threats made with the specific intent to intimidate the victim." (*Lowery,* at p. 426.) Our Supreme Court disagreed and held that "the category of threats that can be punished by the criminal law without violating the First Amendment . . . *is not limited to* threatening statements made with the specific intent to intimidate." (*Id.* at p. 427.) "[T]o ensure the constitutionality of section 140(a), [our Supreme Court] construe[d] it as applying only to those threatening statements that a reasonable listener would understand, in light of the context and surrounding circumstances, to constitute a true threat, namely, 'a serious expression of an intent to commit an act of unlawful violence[.]'" (*Ibid.*)

Appellant acknowledges that the *Lowery* court concluded no specific intent was required for "*all* criminal threat statutes to pass constitutional muster." He nonetheless reads *Lowery*'s analysis of *Black* as "precluding bans on cross burning that are intended to express protected messages." He is mistaken. The concurring opinion in *Lowery* explains that *Black* "did not even purport to announce what criminal intent was constitutionally required. [Citation.] Rather, *Black* involved a criminal statute that expressly *included* a showing of subjective intent—i.e., a Virginia statute banning cross burning with '"an intent to intimidate a person or group of persons."' [Citations.] The constitutional necessity of such a provision was never at issue. [¶] [T]he controversy in *Black* centered on an additional provision of the Virginia criminal statute under which '"any . . . burning of a cross shall be prima facie evidence of an intent to intimidate a

15

person or group of persons.'" [Citations.]" (*Lowery, supra*, 52 Cal.4th at p. 429 (conc. opn. of Baxter, J.).)

Section 11411, subdivision (d), malicious cross burning, imposes criminal liability for conduct where the perpetrator acts "in reckless disregard of the risk of terrorizing the owner or occupant" of the crime site. The objective "reckless disregard standard" mirrors the objective listener standard which our Supreme Court applied in *Lowery* "to ensure the constitutionality" of section 140, subdivision (a), the criminal threats statute. (*Lowery, supra*, 52 Cal.4th at p. 427.) "The need for . . . protection [from such threats] does not depend on whether the speaker *subjectively* intended to threaten the victim. 'A standard for threats that focused on the speaker's subjective intent to the exclusion of the effect of the statement on the listener would be dangerously underinclusive with respect to the first two rationales for the exemption of threats from protected speech.'" (*Id.* at p. 432 (conc. opn. of Baxter, J.).)

Appellant further argues that the malicious cross burning statute is unconstitutional because it criminalizes all cross burning, including ceremonial cross burning. We disagree. The malicious cross burning statute only prohibits cross burning on "the private property of another without authorization for the purpose of terrorizing the owner or occupant of that private property or in reckless disregard of the risk of terrorizing the owner or occupant . . . ." (§ 11411, subd. (d).) Such conduct "does more than convey a message. It inflicts immediate injury by subjecting the victim to fear and intimidation, and it conveys a threat of future physical harm." (*In re Steven S., supra*, 25 Cal.App.4th at p. 607.) Consequently, it falls within the category of a "true threat" which is not protected by the First Amendment. (*Ibid.*)

We also reject appellant's claim that *Steven S*. went too "far in saying that any violation of section 11411 is per se a true threat." Appellant bases this claim on the unfounded premise that *Lowery* states that "[a] true threat requires 'a serious expression of an intent to commit an act of unlawful violence.'" (Citing *Lowery, supra*, 52 Cal.4th at p. 427.) But *Lowery* states that "the category of threats that can be punished by the criminal law without violating the First Amendment *includes but is not limited to*

16

threatening statements made with the specific intent to intimidate." (*Ibid*.) Neither *Lowery* nor *Black* holds that an intent to intimidate is a requisite element of a constitutional cross burning statute.

### *The Malicious Cross Burning Statute Is Constitutional As Applied*

Appellant further claims that as applied to this case, the malicious cross burning statute (§ 11411, subd. (d)) is unconstitutional because it restricts speech based upon its content, in violation of the First Amendment of the federal Constitution. We disagree.

Appellant relies primarily on *R.A.V. v. St. Paul* (1992) 505 U.S. 377, in arguing that the malicious cross burning statute is unconstitutional as applied because it prohibits speech based upon its content. "The ordinance in *R.A.V.* was *facially* unconstitutional as content-based discrimination because it discriminated among fighting words based on race, color, creed, religion, or gender." (*In re Steven S., supra,* 25 Cal.App.4th at p. 610.) Unlike our malicious cross burning statute, *R.A.V.* involved an ordinance that "proscribed *any* cross burning, not just an unauthorized cross burning on another person's private property."[4] (*Ibid*.) As the *Steven S*. court explained, "[t]hat distinction invokes all three of the exceptions set forth in *R.A.V.*," which permit certain forms of content-based discrimination. (*Id.* at p. 611.) We address those exceptions below.

First, *R.A.V.* recognized that "content-based discrimination is valid '[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable . . . .' [Citation.] For example, a state may prohibit only such obscenity as is the most patently offensive in its prurience . . . but may not proscribe only obscenity that includes offensive political messages." (*In re Steven S., supra,* 25

---

[4] The ordinance in *R.A.V.* provided, """Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor."' [Citation.]" (*In re Steven S., supra,* 25 Cal.App.4th at p. 610.)

Cal.App.4th at p. 611.) The California "Legislature has made clear in its declaration of the intent underlying section 11411, subdivision [(d)], that the bases of the statute's content discrimination are the protection of specific victims of malicious cross burning from immediate injury through infliction of fear and intimidation and from the threat of physical harm. (§ 11410.) These are the very reasons the entire classes of speech at issue--fighting words and true threats--are proscribable." (*Ibid.*)

Second, *R.A.V.* allows content-based discrimination against a subclass when the subclass '"happens to be associated with particular "secondary effects" of the speech,' so that the regulation is justified without reference to the speech's content. [Citation.] 'Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.' [Citation.] Thus, for example, a state may impose a zoning restriction on adult motion picture theaters because the restriction targets urban blight, which is a secondary effect of such theaters. [Citation.]" (*In re Steven S., supra*, 25 Cal.App.4th at p. 611.) *R.A.V.* explained that mere ""'anger, alarm or resentment"' is only an emotive reaction, which does not constitute a secondary effect." (*Id.* at p. 612.) In contrast, our malicious cross burning statute "targets secondary effects of malicious cross burning--the infliction, upon a specific victim, of immediate fear and intimidation and a threat of future harm--rather than the racist message conveyed." (*Ibid.*) "[T]he fear and intimidation of the victim of a malicious cross burning crosses the line between emotive reaction and tangible injury." (*Ibid.*)

Third, *R.A.V.* permits "content-based discrimination . . . when 'the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot.' [Citation.]" (*In re Steven S., supra*, 25 Cal.App.4th at p. 611.) "[T]he expressive element of an unauthorized cross burning on another person's property is incidental at best. At its core, this is an act of terrorism that inflicts pain on its victim, not the expression of an idea." (*Id.* at p. 612, fn. omitted.) Based upon the applicability of the *R.A.V.* exceptions, *Steven S.* "conclude[d] that although section

18

11411, subdivision [(d)] discriminates against malicious cross burning on the basis of content, *R.A.V.* permits such discrimination." (*Id.* at pp. 612-613.) We agree.

Citing *Black*, appellant argues that the United States Supreme Court does not share the "view that the Legislature may use [the malicious cross burning statute] to punish intimidating expression only when it is motivated by certain prohibited biases." His argument is not persuasive. First, the controversy in *Black* centered on the provision of a Virginia criminal statute under which "''any . . . burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons.'''" (*Lowery, supra*, 52 Cal.4th at p. 429.) Moreover, there are fundamental differences between the broad Virginia statute in *Black* and our malicious cross burning statute. For example, the Virginia statute applied to cross burnings on public as well as private property. It also applied to defendant Black who burned a cross on private property he rightfully occupied.[5] In contrast, our malicious cross burning statute applies exclusively to unauthorized cross burnings on the property of another person, where the defendant acts with reckless disregard of the risk of terrorizing another person. Such conduct is "an act of terrorism that inflicts pain on its victim, not the expression of an idea." (*In re Steven S., supra*, 25 Cal.App.4th at p. 612, fn. omitted.)

DISPOSITION

Appellant's convictions of arson (count 1) and terrorism by arson (count 3) are reversed and dismissed. The count 1 and count 3 sentences are vacated. The count 1 and count 3 hate crime enhancements are stricken, and the sentences for those enhancements are vacated. The matter is remanded to the trial court for resentencing on counts 2 and 4. Following resentencing, the trial court is directed to amend the abstract

---

**5** The criminal statute in *Black* made it unlawful "''for any person or persons, with the intent of intimidating any person or group of persons, to burn, or cause to be burned, a cross on the property of another, a highway or other public place.''' (*Virginia v. Black, supra,* 538 U.S. at p. 348, quoting Va. Code Ann. § 18.2–423.)" (*Lowery, supra,* 52 Cal.4th at p. 425.)

19

of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

Jacquelyn H. Duffy, Judge

Superior Court County of San Luis Obispo

_____

David Andreasen for Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Noah P. Hill, Deputy Attorney General, for Respondent.

21